## SULTAN DRILLING CO. et al. v. MUNN et al.

No. 22367. Opinion Filed Sept. 29, 1931.

Rehearing Denied Jan. 12, 1932.

Owen & Looney, Paul N. Lindsey, and J. Fred Swanson, for petitioners.

Leo J. Williams and M. J. Parmenter, for respondents

KORNEGAY, J. This is a proceeding to review an award of the Industrial Commission in favor of the respondent, R. C. Munn, made against the Sultan Drilling Company and its insurance carrier, United States Fidelity & Guaranty Company. The award complained of is found in the transcript of the proceedings at page 75, and is as follows:

"Now, on this 25th day of April, 1931, the State Industrial Commission being regularly in session, this cause comes on for consideration pursuant to hearings had at Oklahoma City on February 19th and 24th, 1931, before Inspector T. J. McConville, duly assigned to conduct said hearings, to determine the extent of disability, at which hearings the claimant appeared in person and by his attorney, Leo J. Williams, respondent and insurance carrier being represented by W. B. Gunnels; and the Commission, after considering the testimony taken at said hearings, all reports on file and being well advised in the premises, finds:

"1. That the claimant, R. C. Munn, sustained an accidental personal injury arising out of and in the course of his employment with the respondent herein on the 28th day of July, 1930.

"2. That, as a result of said aforementioned accidental injury, claimant has a permanent disability to the extent of 40 per cent. loss of vision or sight of his right eye, and 40 per cent. loss of vision or sight of the left eye, having an average, taking both eyes into consideration, of 40 per cent. loss of vision in both eyes.

"3. That the average wage of claimant, at the time of said accident, was $7.50 per day.

"4. That claimant sustained a temporary total disability by reason of said accident from July 28, 1930, for a period of three weeks and three days beyond the five-day waiting period, for which compensation has heretofore been paid.

"The Commission is of the opinion: That, under section 7290, paragraph 1, Compiled Oklahoma Statutes 1921, as amended by Session Laws of 1923, c. 61, s. 6, the loss of both eyes constitutes permanent total disability, for which compensation is provided under the law, for a period of 500 weeks. That under section 7290, subsection 3, for percentage loss of use or sight of an eye, is provided for by that portion of the number of weeks as provided in the schedule for the loss of a member or sight of an eye, which the partial loss or use thereof bears to the total loss of use of such member or sight of an eye. That 40 per cent. loss of vision of the right eye and 40 per cent. loss of both eyes, and that claimant is entitled, under the law, to compensation at the rate of $18 per week for a period of 200 weeks in the total sum of $3,600, in addition to temporary total heretofore paid.

"The Commission is of the further opinion: That it is to the best interests of the parties hereto that this order be made a continuing award, and that from September 8, 1930, the date the temporary total disability ended, to April 25, 1931, is 33 weeks due at the rate of $18 per week, or a total sum of $594, the balance to be paid in weekly payments of $18 per week until the full award shall have been paid.

"It is therefore ordered: That within 15 days from this date, the respondent, or its insurance carrier, pay to the claimant the sum of $594, which is 33 weeks due to date of the permanent partial disability, and the balance of $3,006 to be paid in weekly payments of $18 per week.

"It is further ordered: That within 30 days from this date the respondent or insurance carrier file with the Commission proper receipt or other report evidencing compliance with the terms of this order."

Complaint is made that there is no evidence in the record to support the finding of the Commission that the claimant had sustained a 40 per cent. permanent partial loss of vision in both eyes. It is conceded in the brief that where there is any competent evidence in the record to support the finding of the Commission, the same will not be disturbed by this court. Several authorities are cited bearing upon that point. The point is raised, also, that nobody testified that the injury to the eyes of the claimant was permanent, and a resume is made of the testimony, in narrative form, of some of the witnesses.

The brief on behalf of the respondent con-

tended that there was ample testimony to support the finding of the Commission in the shape of the claimant himself, and Dr. S. W. Shelton, and that Dr. A. L. Guthrie's testimony corroborated that of Dr. Shelton. It says that Dr. T. G. Wails testified there was a loss of vision, but that it was due to astigmatism and not due to the result of the injury. Dr. Fred B. Hicks testified the same as Dr. Wails, and Dr. L. M. Westfall also testified that the condition was not due to the accident. The same rule is cited in this brief, with reference to testimony before the Industrial Commission, as is cited in the petitioner's brief.

It appears from the testimony of the respondent that he had been examined several times by various oil companies during the last few years, with reference to sight, and that he had been able to pass the examinations. It developed that he was 29 years old, and that he began to work for the Santa Fe Railroad when he was 18 years old, and some time later he submitted to an examination and qualified as an engineer. He, however, admitted that he was somewhat nearsighted, but evidently from what he said he was able to read the various reports that he would have to use without it being specially observed by others as to his nearsightedness.

There were some four or five doctors, specialists, that testified concerning the claimant's condition. As usual there was variation in their testimony. In the attending physician's report of the accident, his prescription for the eyes was "Eupinol applied to face—protective dressing." The nature of the injury was described as "oil burns, face and eyes." This report was received the 30th of July, 1930. The claimant signed receipt for $63 on the 8th of September, 1930, on the form on which it was stated that the nature of the injury was "face and eyes burned." However, the claimant made a motion to reopen the cause and award further compensation, and the order now complained of is that order, which is set out above.

Testimony was taken before an inspector on the 19th of February, 1931, at Oklahoma City. The claimant testified at page 10, as follows:

"A. Well, I got my eyes full of hot oil. Q. What were you doing at that time? A. Filling the lubricator."

He testified about being taken to Dr. Trice, and then being sent to an eye specialist, Dr. Westfall. That he was off work something like three weeks or a little better, and was subject to treatment,

and was released, but had to go back for treatments. At page 12, on being asked whether he had ever had any trouble before the accident, his answer was:

"A. No, sir; I never noticed that they gave me any trouble when I was reading or working."

He further testified that he took a general examination for the Skelly Oil Company, something like a year before the accident, and passed the examination and was given a job, and was also examined by the Carter Oil Company about five years ago, and was also examined by the Magnolia Petroleum Company. He described his present condition as:

"Q. Does your eyes bother you at this time? A. Well, it seems like they burn me and if I look at anything very long they burn and the lids both hurt and are weak and the vision blurs. Q. Did you have any of this trouble before the accident? A. No, sir."

He was cross-examined about the time of the examinations, and who examined him, and told of some drilling contractors he worked for, and several oil companies. He told about being on the farm for his father near Pawhuska. At page 19, on cross-examination, he described the accident as follows:

"Q. Just tell how it happened. A. Well, when I went to work the lubricator was all dry and I had no oil and I just had to drain out the barrels and scrape the oil—the crude oil—there is a certain amount of steam escaping all the time, and when I went to put this oil in the lubricator, the force of the steam just boiled it over and blew it into my face and eyes."

On being asked how high the oil went, his answer, on page 20, is as follows:

"A. I don't remember just how high it went, but it just blew all over the side of the boiler. Q. Do you know how much went out and did it all hit you in the face or did it just—how did the spray hit you and how much was there? A. Well, if I am not mistaken, there was probably less than bucket full, because I had cleaned up all the oil I could find in the barrels and I went over to see if it was full, and when I did that is when it hit me."

Describing what he did for it, on page 21, he says:

"Q. Did you wash your eyes? A. Yes, sir, I washed my eyes and put some grease on them to prevent them from blistering and I waited for the tool pusher to come around, so I could tell him and then one of the field men took me to the doctor. Q. Did you do any work after this spewed in your face—I mean before going to the doctor? A. No, sir; I just sat in the engine house and

kept putting grease on my face and eyes to keep them from blistering. Q. Did you get, as far as you know, all the stuff out of your eyes? A. I am not sure—the doctor washed my eyes and took some stuff out of them. Q. You could see all right after washing your face? A. I could see, yes, and my vision didn't blur until the next morning and they were hurting me."

It developed that the oil had been gotten from several containers, and some of it was waste oil. He stated the only trouble was that he was just a little nearsighted, but he did not know of any one having told him of it. He gave other details about it, and told about being under Dr. Caley. He was examined by the court, at page 27, and said:

"Q. Mr. Munn, what is the condition of your eyes at this time? A. Well, I have loss of vision that I can notice and am having trouble with my eyes and have headaches. Q. What do you mean by loss of vision—there are objects that you cannot see? A. Yes, sir; I cannot see to read newspapers now like I could. Q. What condition do you think your eyes are in at this time as to what they were prior to July 28, 1930? A. Well,—you mean for vision? Q. What is your loss of vision? A. I don't think I can see as good and any time I'm reading, my eyes hurt me and burn and water. Q. Your eyes were in perfectly good shape on or before July 28th? A. Yes, sir; well, I can't say they were as good as anybody's, what I should have said is that I could see good. Q. What condition are they in at this time? A. Well, I can't read and my eyes bother me when I look off any distance and I cannot recognize anybody any distance away. Q. Is that since the accident? A. Yes, sir. Q. You don't mean to say that your eyes were perfect before the accident? A. No, sir; I don't mean to say that they were perfect and what I should have said was that I couldn't see as good as anybody, but will say that I could see as good as the average person. Q. But as far as you know they were as good as the average person's? A. Yes, sir."

The claimant further testified that he never had any trouble about reading before the accident, and had always been able to read the gauge lines with a little flashlight. He testified that he never had to hold the papers to his eyes, as now, in order to read.

Dr. J. W. Shelton, of Oklahoma City, whose qualifications as an eye, ear, nose and throat specialist were admitted, testified as to having examined the claimant on the 8th of September, 1930. and also on the 10th of February, 1931. He testified that on the first examination he found some reduction in "visual acuity," and his best

vision was 20/30, which would be 8 and a fraction reduction, and that there was an astigmatism in each eye, which is a refractive error. That in a great many cases they found loss of vision following an accident with no pathology, a condition he described as "amblyopia." He further testified that on February 10, 1931, he had a loss of vision of 51.1 per cent. In each eye. He said he was unable to connect the loss of vision with the injury, but did not say that it was not possible. He stated that on the first examination the vision was somewhat variable and would exceed 20/30, but on the last examination he could not get below 20/100.

On cross-examination he stated that he could not say whether a loss of vision was attributable to the accident. He further stated that the manifestation of vision was variable. On redirect examination, he stated that by applying a lens the vision was improved both times. At page 35, he answers as follows:

"A. I don't know whether it was with the lens or without—in my recheck of Mr. Munn's eyes his manifest vision of 20/80 in each eye, with a two diopter cylinder over each eye, at axis 90 and 15 respectively, his best vision was 20/40 in each eye."

At page 36, on being asked about the claimant missing the o's and c's he said he would not give him 20/40 if he missed either.

Dr. A. L. Guthrie qualified as an expert, and testified as follows:

"A. I found his vision in the right eye 20/100 which could be corrected with a glass to 20/50, possibly 20/40—the left eye 20/100—with the glass 20/100. I could find nothing other than the astigmatism."

He stated that something must have caused the loss of vision between the time that Dr. Shelton examined the party the first and second times. A narrative question was put to him giving the history of the case, and he said that on that history he believed that the accident had something to do with the loss of vision, and the best he could get the party to see was 20/100. On being further cross-examined by Mr. Gunnels, who was the representative of the insurance carrier, United States Fidelity & Guaranty Company, the following question was put to him on page 40;

"Q. If the history you had gotten, would you think this accident would cause the loss of vision? A. Well, I think so, in this particular case."

There was also an insinuation in the question about a man not being sincere. but he

stated that it would be detected by the use of the lens. He stated that he thought the claimant was fair in the examination.

Dr. Theodore G. Walls testified that he thought he was called by Dr. Shelton, but that he was instructed to make an examination on the advice of the United States Fidelity & Guaranty Company, and gave the history of the patient about the hot substance burning his face. He said that an examination showed that the cornea was clear, no evidence of any previous burns, the lids and lashes in proper shape, all the lashes in the normal place, showing that the lid has not been destroyed or put out of line by any past burns. That the inside of the eye was clear, and the nerve heads showed considerable astigmatism. That this checking up was done by objective means, and rechecked by subjective refraction. That the patient admitted 20/80 vision in each eye. The best correction he could find out for him, either objective or subjective, was a minus 2.00 cylinder in each eye, and improved his vision to a clear 20/40, and he was able to read part of the 20/30 with each eye. He says on page 51:

"I believe that the only way this injury could have affected his eyes would be by a burn with a resulting scar and if the oil and its impurities did not burn his eyes enough to leave a scar, there would be no impairment from his injury. There was a small hair-like floater present in the left vitreous and this was the only pathology that I could see about his eyes but this did not blur his vision I could seen nothing special about it—many people have them."

He also stated that if the patient had been fitted with the proper glasses in the developing stages, he could have seen normal without this amount of defect, which is not correctable with a glass, and which is not uncommon in eyes that have a large refractive error. He says:

"I see no connection of any sort between the injury and the findings of impaired vision, neither the defect without glasses nor the amount uncorrectable with glasses —it appears to be entirely refractive proposition."

He said that the only thing he could see indicative of pathology was a tiny floater in the left eye, and he did not know how the patient came to have this floater; it did not come from a burn, and there were no scars to show a past burn, and any burn serious enough to produce this condition would have left a scar. In describing the floater in the eye, as to its cause, he said:

"Anything that would be injurious enough to the outside of the eye through cuts and an injury to the inside of the eye and cause what we term scabs or which would leave a scar visible on the inside of the eye, or an injury which might make, for instance a _____ in the eye might leave a floater. This floater was tiny and very small and I was the only one in the four who flound it until it was shown to them and I would say it has not been produced by the injury. Q. In other words, that floater does not affect the vision? A. I am sure that it does not—it had to be magnified with a ten plus lens before we could find it."

On his cross-examination he stated that unless there was some poisonous substance in the hot oil, it would not produce the result. That there would have to be some impurities in the oil. He claimed that there was always pathology present for a loss of vision.

Dr. Fred B. Hicks testified about the history of the case, and the claimant getting hot oil in both eyes, and the oil blistering the skin. That his examination showed a vision of 20/80 in both eyes with a minus 2 cylinder, the party calling all the letters except o's and c's and that he read it slow. His statement, on page 57, was as follows:

"The cornea of both eyes was clear and the iris was normal, both pupils react to light, lens and fundus clear. A slight haziness in the left eye and there were a number of small hair-like specks scattered all through the vitreous and they were only visible after the pupil had been dilated and I did that after the other came—I think Dr. Shelton saw them after the pupil had been dilated. I don't know what his findings were."

He thought the loss of vision was due to the astigmatism. On cross-examination he stated that there was quite a visible opacity in the vitreous in the left eye, that he could not account for some of it, and there was some haziness in the right eye, but there were no hair-like opacities scattered through the vitreous. He claimed that there would have to be a scar before the irritation would affect the vision. He insisted upon the necessity of the injury being sufficiently bad to leave a scar and affect the vision. He stated that there was some haziness in the left eye, and some haziness in the vitreous of the right eye, and thought this was caused by some corneal disease or focal infection. He was examined by the court. He stated that the 20/40 vision was with a glass, and was 20/80 in both eyes when he did not have a glass.

Dr. L. M. Westfall was examined. The claimant was treated in his office, and he gave the objective symptoms and the

subjective ones. He stated that when he examined the claimant, his vision in the right eye was "20/30 part," in the left eye "20/30 part," and with correction a vision of "20/20 part" in each eye. He made a report on August 30th. The best rating obtained was 20/40 in each eye, and at this time he had a low grade of "conjunctivitis." On September 22, 1930, his vision was 20/40, one letter out, in the right eye, and 20/30, one letter out, in the left eye. He could not account for the discrepancy of vision. The party returned on February 11th and 12th, and was examined by other doctors. His pupils were somewhat dilated. Vision in the right eye was "20/40 part," and in the left eye "20/30 part," and he was unable to distinguish between the o's and the e's. Refraction had been attempted on several occasions, but he had not been able to get the same results twice. He could see the elongated floater in the eye, but it would not account for the great amount of loss of vision complained of. On February 21st, the best vision obtained at this time was 20/80 in each eye, while on February 11th it was 20/40, 16.4 per cent. loss of vision, not accounting for his inability to distinguish the o's and c's, and 20/30 is possibly 10 or 11 per cent. He gave as his opinion that if any vision had been lost as a result of the injury, there would, of necessity, be scars or haziness of the cornea in evidence. The vitreous floater he called an "opacity." but he did not think it was caused by the accident.

He was cross-examined, and it developed from his examination that the oftener he examined the patient, the worse the vision got, and the best obtained was 20/80 on the last, which would be 41.5 per cent. loss of vision.

Dr. Shelton was recalled some days after the first examination, and referring to the vitreous opacity in each eye, on the last examination, he says:

"Q. Did you find anything on this examination—any pathological evidence to indicate that the injury of July 28th had caused any loss of vision? A. Nothing more than in my former examination with the exception I was able to discern some minute vitreous opacity in each eye at the last examination after searching the interior of the eye very carefully—I did not find those in the other examinations. Q. What would that indicate, Doctor? A. Well, they were so small, they would have no effect on the visual acuity. That might indicate a number of things—it might indicate that his system was in a toxic condition or it might be from some of the uveal tract or it might indicate a low grade of ciliar inflammation and it might indicate pyelitis."

The claimant, being recalled, was asked by the Commission about his examinations, and stated that he had been examined when he first started to work, and he had not had trouble with his eyes before the injury, and his nearsightedness had not bothered him.

With the evidence before them, and the patient before them, the Commission made the award. From the appearance of the examination, the man's condition is evidently growing worse. The vitreous humor is becoming more opaque, and the floating bodies more numerous. We cannot say that there was no competent evidence to support the award of the Industrial Commission. in view of the objective symptoms and the history of the case related by the patient.

The award of the Industrial Commission is · therefore affirmed. There is some intimation in the briefs that the condition of the claimant is improving. The Commission evidently left open the question of a further application to change the award under its continuing jurisdiction.

HEFNER, CULLISON, and SWINDALL, JJ., concur. McNEILL, J., concurs in the conclusion. LESTER, C. J., CLARK, V. C. J., and ANDREWS, J., absent. RILEY, J., dissents because he does not find any evidence of permanency of loss of vision.